JOHN A. HIRST, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hirst v. Commissioner
Docket No. 31291-83.
United States Tax Court
T.C. Memo 1986-321; 1986 Tax Ct. Memo LEXIS 295; 51 T.C.M. (CCH) 1597; T.C.M. (RIA) 86321; July 28, 1986. *295 Petitioner participated as a pilot, off-loader, and lookout in marijuana smuggling activities during 1980. Held, petitioner received $29,500 in taxable income for his involvement in marijuana smuggling activities. Held further, petitioner realized a long-term capital gain of $29,250 upon his transfer of property in satisfaction of a promissory note. Held further, petitioner is liable for the self-employment tax on income received by him for his participation in marijuana smuggling activities. Held further, petitioner is not liable for an addition to tax pursuant to sec. 6653(b). John A. Hirst, pro se. Max K. Boyer, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined a deficiency in petitioner's 1980 Federal income tax in the amount of $68,173.27 together with an addition to tax pursuant to section 6653(b) [1] in the amount of $34,086.64. The issues presented for consideration are: (1) Whether petitioner received unreported taxable income of $104,000 from marijuana smuggling activities; (2) whether petitioner realized a long-term capital gain of $32,000 upon his transfer of real property in satisfaction of a promissory note; *296 (3) whether the taxable income received by petitioner from marijuana smuggling activities constitutes self-employment income; (4) whether petitioner's underpayment of tax was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner John A. Hirst (Hirst) resided in Marianna, Florida, at the time his petition was filed. Hirst and his wife, Nancy Hirst, filed separate returns for the calendar year 1980. Subsequent to the issuance of the notice of deficiency involved herein, Hirst filed an amended return showing a net increase of $13,000 in his taxable income due to his involvement in marijuana smuggling activities during the period March to July 1980. Hirst was employed as an aircraft mechanic in Mariana until April 15, 1980. While employed as a mechanic, Hirst installed long-range fuel tanks and performed maintenance on planes owned or operated by Charles *297 Etheridge, Sr. (Etheridge). Etheridge had been involved in drug smuggling activities prior to the events at issue, but Hirst had not. In March 1980, Etheridge approached Hirst about the possibility of participating in marijuana smuggling activities. Hirst was receptive to the idea, and participated in four "runs" during the month of April. On April 1, Hirst acted as lookout and unloader for a twin engine Beachcraft plane. Hirst was to be paid $4,000 for his participation in this run. Approximately 1 week later, Etheridge and Hirst attempted to fly an aircraft south from Florida to pick up marijuana. The plane had mechanical problems, however, which forced them to return to Florida without picking up the load. Later in April, Etheridge and Hirst flew an aircraft to Jamaica, picked up 600 pounds of marijuana, and successfully returned to Florida. Hirst was to be paid $20,000 as pilot and unloader on this third trip. Shortly after his successful run to Jamaica, Hirst again acted as lookout and unloader for the twin engine Beachcraft. The final two loads of marijuana were taken to Dothan, Alabama, for sale to prearranged buyers.The expected sale did not occur, however, and Etheridge *298 and Hirst were forced to look for alternative buyers. Negotiations were held at Hirst's house in Marianna with prospective buyers located by Hirst. Etheridge subsequently returned to Dothan, but was arrested with the marijuana prior to its disbursement. Hirst was not arrested for his participation in the April 1980 runs, and Etheridge was subsequently released on bail. Prior to Etheridge's arrest, Hirst was paid a total of $3,000 by Etheridge for acting as pilot, lookout, and unloader. In July 1980, Etheridge and Hirst conspired with numerous other people to smuggle marijuana into the United States aboard a DC-6 aircraft. The plan called for picking up approximately 10,000 pounds of marijuana, making this a significantly larger operation than those undertaken in April. Etheridge was responsible for arranging the unloading of the aircraft upon its arrival in Florida, and was to fly in the plane as part of the crew. Etheridge was to be paid a salary of $100,000 for his participation. Operations on the ground were supervised by Don Kirshner (Kirshner), who was associated with the owners of the aircraft. Etheridge recruited Hirst to participate as a member of the unloading crew, *299 which was responsible for setting up the runway lights, unloading the aircraft, and refueling the plane. Hirst was specifically responsible for providing a fuel truck. The unloading crew was to be paid a commission of 10 percent based on a value of $250 a pound of marijuana. Prior to the expected date of arrival of the DC-6, Hirst held at least one meeting at his house to make arrangements for unloading the aircraft. Hirst wanted some security to insure that the unloading crew would receive its 10-percent commission. Consequently, it was agreed that Hirst would hold 10 percent of the marijuana unloaded from the plane as security. The DC-6 was to be flown from Colombia to Florida on July 4, 1980. Due to logistical problems in Colombia, the crew was unable to return the plane to Florida until the night of July 7. Upon the plane's arrival, Hirst loaded his pickup truck with bales of marijuana to be stored in his attic as security pursuant to the prior agreement. The amount of Marijuana actually on the plane, and the amount held by Hirst as security, is undetermined. The remainder of the marijuana was loaded into a truck and taken to Tallahassee, Florida. Etheridge drove to Miami *300 to receive the initial installment on funds owed to him and the unloading crew. Etheridge received $5,500 from the owners of the aircraft as an initial payment. Etheridge and Hirst were in communication throughout this period, and Etheridge assured Hirst that additional payments were to be received. Based upon Etheridge's assurances, and with some concern for his personal welfare, Hirst gave the marijuana held by him to the principal smugglers approximately 1 week after the landing. At the time Hirst relinquished the marijuana, he had received no payment for his participation in the landing. Approximately 2 weeks after the landing, Hirst drove from Marianna to Miami to pick up the initial installment on the unloading crews' 10-percent commission. While in Miami, Hirst was paid $19,500 by Etheridge in 10-, 20-, and 50-dollar bills. It was at this time that Hirst and Etheridge agreed upon the amounts to be paid by them to various members of the unloading crew. The amount each member was to be paid was recorded in a small black book carried by Etheridge. Hirst was to act as a conduit for Etheridge in satisfaction of Etheridge's obligations to certain members of the crew. Hirst subsequently *301 received an additional payment of $10,000 when Etheridge returned to Marianna, and a payment of $2,000 from Carlos Berreta in Tallahassee, Florida. Hirst used $5,000 of the $31,500 received by him to pay a co-conspirator's attorney's fees. [2] Etheridge and Hirst were joined by their wives in Miami at the time Etheridge paid Hirst the $19,500. While in Miami, Hirst purchased a motorcycle for approximately $4,000, a video cassette recorder and movies for approximately $1,000 and some clothing for his wife for approximately $200. Additionally, at some point in 1979-1980, Hirst purchased a new automobile for his wife. On August 6, 1980, Hirst borrowed $35,000 from his father to purchase a house. Hirst intended to repay his parents with proceeds from his participation in the DC-6 landing. According to representations made by Etheridge, Hirst had reason to believe that $85,000 in additional proceeds *302 were forthcoming. On August 7, 1980, Hirst purchased a house in Marianna for $34,300. He paid for it with the funds borrowed from his father in the form of two cashiers checks issued by his parent's bank and in his mother's name. Of this amount, $22,800 was paid to the owners of the house and $11,500 was paid to the bank in satisfaction of a second mortgage on the property. Included in the payment to the bank was an amount sufficient to prepay the mortgage payments for 1 year. On November 25, 1980, Hirst transferred his undivided one-half interest in real property located in Washington County, Florida to his parents. The property was owned jointly by Hirst and his first wife. The transfer was made in satisfaction of the $35,000 promissory note given to his parents on August 6, 1980. Hirst and his former wife had purchased the Washington County property on May 6, 1971. Hirst claimed a purchase price of $12,000, and entered into evidence a policy of title insurance for $11,500. The property was used as security for a loan borrowed by Hirst and his first wife on March 31, 1971, in the amount of $16,800. On August 12, 1980, Hirst and Nancy Hirst were arrested with a number of his *303 fellow conspirators for their activities associated with the DC-6 flight. After Hirst's arrest, Nancy Hirst posted a bond of $5,000 to secure his release. Hirst was found guilty of conspiring to possess marijuana with intent to distribute and his conviction was affirmed upon appeal to the Eleventh Circuit. Nancy Hirst was found not guilty. Hirst was represented on appeal by John Daniel (Daniel), who had represented Nancy Hirst during discovery and trial. Daniel advised Hirst as to tax matters and prepared his original 1980 return on which no smuggling income was reported. The ringleader of these activities was Etheridge, who has since testified in cooperation with the Government in return for leniency towards his son, who was also involved in the plot. ULTIMATE FINDINGS OF FACT (1) Hirst received $34,500 for his participation in marijuana smuggling activities. (2) Hirst distributed $5,000 of his receipts in satisfaction of a co-conspirator's attorney's fees. (3) Hirst transferred his undivided one-half interest in the Washington County property to his parents in satisfaction of his $35,000 debt to them. OPINION The first issue for decision is whether Hirst received unreported *304 taxable income of $104,000 from his marijuana smuggling activities. Respondent's determination is presumptively correct, and the burden of proof rests with petitioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). This issue is an entirely factual one, to be decided on the basis of Etheridge's and Hirst's conflicting testimony. As an initial observation, neither Etheridge nor Hirst impressed us as being a particularly credible witness. Both were admittedly involved in a conspiracy to smuggle marijuana into the United States, and both have an interest in minimizing the proceeds received and retained by them. Etheridge admits to having received approximately $264,000, and contends that he transferred approximately $165,000 of this amount to Hirst. Hirst admits to having received $26,000 from Etheridge, and contends that he transferred $13,000 of this amount to fellow conspirators. As the trier of fact, we are convinced that neither Etheridge's nor Hirst's version of events is wholly correct. Accordingly, we have adopted the most credible portions of the testimony presented, and have also considered facts as to the money otherwise earned, borrowed, and expended by Hirst *305 during the period at issue. Having carefully weighed all of the evidence available to us, including the conflicting testimony, we have determined the facts to be as set forth in our findings. On this basis we found that Hirst received and retained $3,000 for his participation in the April 1, 1980 run, not $4,000 as respondent contends. Additionally, we found that Hirst received $31,500 for the DC-6 run, and retained $26,500 of this amount. We are satisfied that Hirst acted as a mere conduit as to $5,000. We are not persuaded that he passed on to his associates more than this sum. In Diamond v. Commissioner,56 T.C. 530 (1971), affd. 492 F.2d 286 (7th Cir. 1974), we stated: We accept as sound law the rule that a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit. * * * [56 T.C. at 541.] Accordingly, we reduce Hirst's gross receipts by $5,000. See James v. United States,366 U.S. 213, 219 (1961); North American Oil Consolidated v. Burnet,286 U.S. 417, 424 (1932). Thus, we found that Hirst received $29,500 in taxable income for his involvement *306 in marijuana smuggling activities during 1980. [3]
The next issue for decision is whether Hirst recognized a long-term capital gain of $32,000 upon his transfer of the Washington County property to his parents in satisfaction of the $35,000 note. Respondent contends that Hirst had a $3,000 basis in his one-half interest in the property, and that the transfer constituted a taxable exchange pursuant to section 1001. Hirst contends that he and his former wife purchased the property for $12,000 and that his one-half interest was transferred to his parents as security for the $35,000 loan. We conclude that Hirst and his former wife purchased the property for $11,500 based on the amount of title insurance taken out on the property at the time of purchase. [4] Additionally, we find that Hirst transferred his one-half interest in the property to his parents in satisfaction of the $35,000 as stated in the quit-claim deed used to transfer title to his parents. [5] Hirst had a basis of $5,750 in his undivided one-half interest, and realized a long-term capital gain of $29,250 upon his transfer of the property *307 in satisfaction of the note. [6] *308 We must next decide whether Hirst was engaged in the trade or business of smuggling marijuana in 1980 as a self-employed individual. The tax on self-employment income is part of the income tax and is subject to the jurisdiction of the Tax Court to the same extent and in the same manner as the income tax. Section 1.1401-1(a), Income Tax Regs. Respondent has taken the position that the tax is imposed on individuals engaged in illegal activities where they otherwise qualify. See Rev. Rul. 60-77, 1960-1 C.B. 386. The burden is on the taxpayer to show that he is not liable for the tax. Rule 142(a). Since petitioner offered no proof on this issue, respondent's determination is presumed to be correct. Accordingly, petitioner is liable for the self-employment tax on income received by him for his participation in marijuana smuggling activities during 1980. The final issue for decision is whether Hirst's underpayment of tax was due to fraud pursuant to section 6653(b). Under section 6653(b) respondent has the burden of proof by clear and convincing *309 evidence. Section 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion, 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner,69 T.C. 391 (1977). Fraud is not to be imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner,53 T.C. 96 (1969). Fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106 (1969). Respondent contends that, at the time his 1980 return was filed, Hirst failed to report a substantial amount of smuggling income on which *310 he knew a tax was owed. Hirst concedes that some income had been received, but maintains that its omission was an oversight and not an attempt to evade the payment of tax.Hirst's return was prepared by Daniel, who was concurrently handling Hirst's appeal to the Eleventh Circuit and who had represented Nancy Hirst during the trial. In light of respondent's burden of proof, we are not convinced that Hirst failed to report his smuggling income with a "specific purpose to evade a tax believed to be owing." Carter v. Cambell,264 F.2d 930, 936 (5th Cir. 1959); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Hirst is not a sophisticated businessman. He relied upon the advise of Daniel as to both the preparation of his return and the handling of his appeal.[7] Hirst maintains, and we believe, that he was preoccupied with the appeal of his criminal conviction and did not question the return prepared by Daniel. Daniel knew of Hirst's criminal activities and must have known that Hirst had received some income therefrom. Thus, Daniel was in possession of information necessary to prepare Hirst's return or at least to make appropriate inquiry. *311 Hirst became concerned about the omission subsequent to his release from prison, and filed an amended return at that time. While the facts may create a suspicion of fraud, "[m]ere suspicion of fraud and mere doubts as to the intentions of the taxpayer are not sufficient proof of fraud." Switzer v. Commissioner,20 T.C. 759, 765 (1953). Therefore, respondent has not met his burden of showing, by clear and convincing proof, that petitioner received and deliberately failed to report substantial amounts of income with the intent to evade the payment of income tax. We conclude that fraud has not been proven and that the additions to tax provided in section 6653(b) are inappropriate. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Hirst testified that out of the $26,000 he admitted receiving, he distributed $5,000 to one of his helpers and $3,000 to another in addition to this $5,000. Payment of the $5,000 was substantiated by testimony of the receipient, but there was no corroboration of the two additional payments.↩
3. This amount includes the $13,000 previously recognized by Hirst in his amended 1980 return.↩
4. Hirst entered as evidence a warranty deed dated May 6, 1971 conveying the Washington County property to him and his former wife. Stamps affixed to the deed indicate the payment of a Florida documentary stamp tax of $34.50. Pursuant to Fla. Stat. § 201.02(1)↩ (1971) a tax of $ .30 for each $100 of consideration paid is levied upon instruments conveying an interest in real property. A purchase price of $11,500 would result in a stamp tax of $34.50. Thus, the stamp tax supports our conclusion that Hirst paid $11,500 for the Washington County property as suggested by the policy of title insurance. 5. The quit-claim deed from Hirst to his parents reads in part as follows: "This deed is given in full satisfaction of that one certain promissory note, dated the 6th day of August, 1980, from John A. Hirst to John Y. Hirst and wife, Hazel Hirst, in the amount of $35,000.00." ↩
6. On brief, respondent argues that Hirst's parents knew about Hirst's smuggling activities, and that Hirst's father knowingly allowed smuggling proceeds to be laundered through his account. While Hirst's father may have had cause to question how Hirst expected to repay the $35,000 loan, we have no reason to believe that his father knew of Hirst's smuggling activities, much less allowed his account to be used to launder funds.
7. Respondent did not call Daniel to testify as to his preparation of Hirst's return. Therefore, we do not know why Daniel failed to include any smuggling income on the return despite his knowledge of Hirst's activities. On brief, Hirst suggests that Daniel felt it would jeopardize Hirst's appeal. Regardless of Daniel's reasoning, his involvement in the preparation of the return weighs against our finding fraud.↩